UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHER~

Case:2:20-cr-20550
Judge: Murphy, Stephen J.
MJ: Whalen, R. Steven
Filed: 11-04-2020 At 04:11 PM
SEALED MATTER (LG)

United States of America,

   Plaintiff,

v.

D-1 Arash Yousefi Jam,
  Also known as
   Arash Yousefijam,

D-2 Amin Yousefi Jam,
  Also known as
   Amin Yousefijam,

D-3 Abdollah Momeni Roustani,
  Also known as
   Abdollah Momeni,
  Also known as
   Ab Momeni,
  Also known as
   Amir Amiri,

   Defendants.

_____

Violations:

18 U.S.C. § 371
(Conspiracy)

50 U.S.C. § 1705
(International Emergency
Economic Powers Act)

31 C.F.R. Part 560
(Iranian Transactions and
Sanctions Regulations)

18 U.S.C. § 554
(Smuggling goods from the
United States)

18 U.S.C. § 1956
(Conspiracy to commit money
laundering)

18 U.S.C. § 981(a)(1)(C)
18 U.S.C. § 982(a)(1)
28 U.S.C. § 2461(c)
(Criminal Forfeiture)

# INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At all times material to this indictment:

### The Defendants and Other Individuals and Entities

1. Defendant Arash Yousefi Jam, also known as Arash Yousefijam (ARASH JAM), is an Iranian national who lives in Canada.

2. Defendant Amin Yousefi Jam, also known as Amin Yousefijam (AMIN JAM), is an Iranian national who lives in Iran and/or Canada.

3. Defendant Abdollah Momeni Roustani, also known as Abdollah Momeni, Ab Momeni, and Amir Amiri (MOMENI), is an Iranian national believed to be living in Iran.

4. Iranian Person 1 was a frequent contact of ARASH JAM, AMIN JAM, and MOMENI.

5. Spanish Company 1 is a company based in Spain that manufactures electrical discharge machining (EDM) technology and equipment for customers around the world. EDM is a metal fabrication process that uses thermal energy to remove excess material from an object to create the desired shape for a particular task. Spanish

2

Company 1 sells some of its technology and equipment through companies located outside of Spain, including in the United States.

6.     Spanish Company 2 is a company based in Spain that sells EDM technology and equipment, including the technology and equipment of Spanish Company 1.

7.     US Company 1 is a company based in the Eastern District of Michigan, in the United States, that sells EDM technology and equipment. US Company 1 is a subsidiary of Spanish Company 1.

8.     US Company 2 is an industrial automation supply company based in the United States that sells servo motors. A servo motor is an electrical device that can push or rotate an object with great precision. Servo motors are often used in automated manufacturing.

9.     US Company 3 is a company based in the United States that sells railroad equipment and parts (with US Companies 1 and 2, the "US Companies").

10.     UK Company is a company based in the United Kingdom that sells EDM technology and equipment, including the technology and equipment of Spanish Company 1.

11.    Global Shipping Company 1 is a company based in the United Arab Emirates (UAE) that exported goods from the United States to the UAE on behalf of defendants ARASH JAM, AMIN JAM, and MOMENI.

12.    Global Shipping Company 2 is a company based in the United States that refused to export goods to Iran on behalf of defendants ARASH JAM, AMIN JAM, and MOMENI.

13.    Global Shipping Company 3 is a company based in Norway that assisted defendants ARASH JAM, AMIN JAM, and MOMENI with exporting goods from the United States to the UAE, and then reexporting those goods from the UAE to Iran.

14.    US Shipping Company 1 is a company based in the United States that exported goods from the United States to the UAE on behalf of defendants ARASH JAM, AMIN JAM, and MOMENI.

15.    US Shipping Company 2 is a company based in the United States that exported goods from the United States to the UAE on behalf of defendants ARASH JAM, AMIN JAM, and MOMENI.

## The International Emergency Economic Powers Act and the Iranian Transactions and Sanctions Regulations

16.    The International Emergency Economic Powers Act (IEEPA) authorizes the President of the United States to deal with "unusual and extraordinary threat[s] . . . to the national security, foreign policy, or economy of the United States" by declaring a national emergency with respect to such threats. 50 U.S.C. § 1701(a). Since 1979, and through the present day, US presidents have repeatedly declared that the actions and policies of the Government of Iran (GOI) pose a threat to the United States' national security including, among other actions, the GOI's pursuit of nuclear weapons and its sponsorship of terrorism.

17.    Since 1979, the United States has adopted a series of statutes, executive orders, and regulations designed to check the national security threat posed by the GOI's policies and actions, including the Iranian Transactions and Sanctions Regulations (ITSR). 31 C.F.R. Part 560. The ITSR target, among other things, exports from the United States or by US persons for the benefit of Iran.

18.    The Office of Foreign Assets Control (OFAC) of the US Department of the Treasury administers and enforces economic and trade sanctions based on US foreign policy and national security goals

5

against targeted foreign countries and regimes, terrorists, international narcotics traffickers, those engaged in activities related to the proliferation of weapons of mass destruction, and other threats to the national security, foreign policy, or economy of the United States. OFAC issued the ITSR.

19. Without a license from OFAC, the ITSR prohibit the following:

    a. "The exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran." 31 C.F.R. § 560.204.

    b. "The reexportation from a third country, directly or indirectly, by a person other than a United States person, of any goods, technology, or services that have been exported from the United States" if undertaken with knowledge that the reexportation is intended specifically for Iran or the GOI. *Id.* § 560.205.

c.   "Any transaction on or after the effective date [meaning
1979] that evades or avoids, has the purpose of evading or
avoiding, causes a violation of, or attempts to violate any
of the prohibitions set forth in this part is prohibited," and
that "[a]ny conspiracy formed to violate any of the
prohibitions set forth in this part is prohibited." *Id.*
§ 560.203.

20.    Pursuant to IEEPA, "[i]t shall be unlawful for a person to
violate, attempt to violate, conspire to violate, or cause a violation of
any license, order, regulation, or prohibition issued under this title." 50
U.S.C. § 1705(a). IEEPA also provides a criminal penalty for anyone
who, among other things, willfully conspires to commit any of the
unlawful acts described in Section 1705(a). *See id.* § 1705(c).

21.    The Grand Jury incorporates by reference and realleges
these General Allegations into each and every count of this indictment
as though fully alleged therein.

## COUNT ONE
**Conspiracy to unlawfully export goods to Iran and to defraud
the United States, in violation of 18 U.S.C. § 371, 50 U.S.C. § 1705,
and 31 C.F.R. Parts 560.203, 560.204, and 560.205**

7

## The conspiracy

22.    Beginning in or around January 2015, and continuing

through at least in or around February 2017, defendants ARASH JAM,

AMIN JAM, and MOMENI, did willfully combine, conspire, and agree

with each other and others known and unknown to the Grand Jury, to

commit an offense against the United States, that is, to willfully export

and cause the exportation of goods from the United States to Iran in

violation of the prohibitions imposed upon that country by the United

States government, without having first obtained the required licenses

from OFAC, in violation of Title 50, United States Code, Section 1705

(IEEPA) and Title 31, Code of Federal Regulations, Parts 560.203 and

560.204 (ITSR), all in violation of Title 18, United States Code, Section

371.

23.    Beginning in or around January 2015, and continuing

through at least in or around February 2017, ARASH JAM, working

with AMIN JAM and MOMENI, placed orders for goods owned by the

US Companies and caused them to be shipped through the UAE to Iran,

attempting to hide the true location and nature of the end users, who

were in Iran.

8

24.   The conduct alleged in this Count occurred within the Eastern District of Michigan and elsewhere and is therefore within the venue of the United States District Court for the Eastern District of Michigan pursuant to Title 18, United States Code, Sections 3237(a) and 3238.

## Objects of the Conspiracy

25.   The objects of the conspiracy were:

a.   to acquire goods from the United States in order to supply those goods to entities and end users in Iran;

b.   to conceal from United States companies and the United States government that the goods were destined for end users in Iran;

c.   to engage in financial transactions to facilitate the exports; and

d.   to evade the regulations, prohibitions, and licensing requirements of IEEPA and the ITSR.

## Manner and Means of the Conspiracy

26.    The manner and means by which the defendants and their

coconspirators sought to accomplish these objects of the conspiracy

include, among others, the following:

a.    The defendants and their coconspirators planned and

acted outside of the United States to acquire goods;

b.    The defendants and their coconspirators used email to

communicate with one another and with other individuals, including

individuals located in the United States, Canada, and Iran;

c.    The defendants and their coconspirators purchased

goods from companies in the United States for ultimate shipment to

Iran;

d.    The defendants and the coconspirators used third

parties to arrange for payment of the goods, in United States currency;

e.    The defendants and their coconspirators intentionally

concealed from companies located in the United States, specifically the

US Companies and US Shipping Companies 1 and 2, the true nature of

the ultimate end use and true identities of the ultimate end users of the

10

goods, by providing false and misleading information about the ultimate
end use and end users; and

      f.    The defendants and their coconspirators caused the
goods to be exported from the United States to individuals and entities
located in Iran through the UAE, without obtaining any license from
OFAC.

**Overt Acts**

    27.    In furtherance of the above-described conspiracy, and in
order to carry out the object thereof, the defendants and others known
and unknown to the Grand Jury committed or caused to be committed,
in the Eastern District of Michigan and elsewhere, at least one of the
following overt acts, among others:

*May 22, 2015 export of nine electrical discharge boards intended for Iran
[US Company 1, purchase 1; Global Shipping Company 1]*

    28.    On or about January 9, 2015, ARASH JAM emailed US
Company 1 with a price request for nine electrical discharge boards.
ARASH JAM stated that he was in Toronto, but that the boards were
going to a company in the UAE. On or about that same day, US
Company 1 sent a price quote for the items back to ARASH JAM, which
ARASH JAM forwarded to MOMENI. ARASH JAM forwarded the price

11

quote from US Company 1 to MOMENI a second time on or about

January 14, 2015.

29.    On or about January 20, 2015, MOMENI responded to

ARASH JAM and attached the price quote from US Company 1 along

with two additional documents that appear to be written in Farsi also

showing price quotes. MOMENI told ARASH JAM that the prices US

Company 1 quoted varied for several of the items.

30.    On or about January 24, 2015, and again on or about

February 17, 2015, US Company 1 asked ARASH JAM for the model

and serial number of the machine for which ARASH JAM was

requesting parts. ARASH JAM forwarded the first email to MOMENI.

ARASH JAM responded to US Company 1's February 17, 2015, email

by stating that the model was a WIRE-CUT KE 600, but that he did not

have the serial number. The WIRE-CUT KE 600 model EDM machine

was manufactured by Spanish Company 1.

31.    On or about February 19, 2015, US Company 1 sent ARASH

JAM an updated price quote, which ARASH JAM forwarded to

MOMENI. MOMENI responded in Farsi stating, "God bless you, you

really get it at this price."[1] Also on or about that same day, ARASH

JAM asked US Company 1 if he could have the items shipped directly

from Spanish Company 1 to save money. On or about February 24,

2015, US Company 1 told ARASH JAM that the parts could be shipped

from Spanish Company 1.

32.   On or about February 26, 2015, MOMENI emailed ARASH

JAM in Farsi and stated that they needed a discount otherwise the

products would not be "economical." Later that same day, US Company

1 sent an updated price quote to ARASH JAM, who forwarded it to

MOMENI. The updated price quote listed the price for nine electrical

discharge boards by part number. On or about March 5, 2015, US

Company 1 emailed ARASH JAM telling him that Spanish Company 1

had all of the parts in stock. ARASH JAM forwarded this email to

MOMENI.

33.   Less than two weeks later, on March 17, 2015, ARASH JAM

emailed UK Company for a competing price quote on the nine electrical

discharge boards that he had inquired about from US Company 1. On

---

[1] Note that neither this nor any other translation referenced herein is a
verbatim translation of the original Farsi.

March 25, 2015, ARASH JAM emailed UK Company again, stating that

the parts requested were for a 2004, model KE 600 machine, with serial

number 10853. (A month earlier, US Company 1 had asked ARASH

JAM for the EDM machine's serial number and he had responded that

he did not have it.) On or about the same day that ARASH JAM

provided UK Company with the machine's serial number, UK Company

told ARASH JAM that, "Unfortunately, I . . . was told that the machine

is in a prohibited Country. Therefore, we will not send a [price]

quotation to you." (emphasis in original).

34.    ARASH JAM, AMIN JAM, and MOMENI later confirmed

that the EDM machine was located in Iran:

   a. On or about October 6, 2016, ARASH JAM sent AMIN
      JAM a draft email that stated that they needed additional
      parts for a 2004, model KE 600 machine located in
      Tehran, Iran. In that draft email, ARASH JAM stated
      that the serial number for that machine was 10853.

      i. On or about October 6, 2016, AMIN JAM sent the
         draft email referenced in paragraph 34a to Spanish
         Company 1, admitting that the machine in question
         was in Iran.

      ii. On or about October 7, 2016, ARASH JAM sent the
          draft email in paragraph 34a to US Company 1,
          again admitting that the machine in question was in
          Iran.

b. On or about January 10, 2017, ARASH JAM sent MOMENI a draft email meant for Spanish Company 1. The email stated that Shahrvand Company was acting as an agent for SAIPA Automobile Manufacture, an automobile manufacturing company headquartered in Tehran, Iran, and that he was trying to get parts for a 2004, model KE 600 machine, with serial number 10853.

35.     After the UK Company told ARASH JAM that it would not provide him with a price quote because the machine was in a prohibited country, he emailed US Company 1 on or about March 26, 2015, asking for a lower price. On or about March 27, 2015, US Company 1 sent ARASH JAM a final price quote of $7,586.06, and indicated that the parts could be picked up in Spain.

36.     On or about March 31, 2015, US Company 1 sent its bank account information to ARASH JAM so that he could wire the money for the nine electrical discharge boards. On or about that same day, ARASH JAM sent the bank account information to MOMENI.

37.     On or about April 19, 2015, MOMENI emailed ARASH JAM confirmation of payment to US Company 1; on or about that same day, ARASH JAM sent the confirmation to US Company 1. Bank records confirm that on or about April 21, 2015, a bank in the UAE transferred the funds for the electrical discharge boards via wire to US Company 1.

On or about April 22, 2015, US Company 1 told ARASH JAM that it received payment and again confirmed that the items could be picked up in Spain.

38.    On or about April 27, 2015, US Company 1 emailed ARASH JAM a packing slip for the electrical discharge boards and the address in Spain where they could be picked up. On or about the same day, ARASH JAM forwarded the email to MOMENI. Also on or about that same day, MOMENI emailed ARASH JAM and told him to use Global Shipping Company 1 to transport the items from Spain to the UAE.

39.    On or about April 28, 2015, ARASH JAM contacted Global Shipping Company 1 and requested a quote to move the items from Spain to the UAE. Global Shipping Company 1 agreed to transport the items from Spain to the UAE, but never completed that shipment because, as described further below, Spanish Company 1 refused to allow the goods to be picked up in Spain over concern that the goods were destined for Iran.

40.    On or about May 7, 2015, US Company 1 emailed ARASH JAM and repeated its request for the model and serial number of the machine for which ARASH JAM had ordered the electrical discharge

boards. On or about May 9, 2015, ARASH JAM responded that he would ask his UAE colleagues to send that information. On or about May 11, US Company 1 emailed again, telling ARASH JAM that it needed the machine model and serial number quickly. Two months prior, in March 2015, ARASH JAM told UK Company that the machine's serial number was 10853.

41.    On or about May 11, 2015, ARASH JAM emailed Spanish Company 2 asking to place an offer to buy a WIRE-CUT KE 600 model EDM machine that he saw advertised on Spanish Company 2's website. ARASH JAM stated that the machine was for a company in the UAE, and specifically asked for the year of the machine and the serial number.

42.    On or about May 12, 2015, Spanish Company 2 responded to ARASH JAM, providing a document about the machine for sale, including pictures. Spanish Company 2 stated that the machine it was selling was a 2004 model with serial number 10.744. Also on or about that same day, ARASH JAM forwarded the information from Spanish Company 2 to MOMENI; AMIN JAM also obtained this information from Spanish Company 2. With this information in hand, on or about

17

that same day, May 12, 2015, ARASH JAM emailed US Company 1, stating that the machine for which he had ordered the parts was a 2004, model KE 600 machine, with serial number 10.744—the same serial number that he had obtained from Spanish Company 2 for the machine that it was advertising for sale in Spain.

43. On or about May 12, 2015, US Company 1 responded to ARASH JAM's email, asking from whom he bought the machine and where it was currently located. On or about that same day, ARASH JAM responded, stating that the machine was currently in RAK [Ras al Khaimah], UAE.

44. On or about May 12, 2015, US Company 1 responded to ARASH JAM, stating that "Spain is thinking these parts are being sent to Iran. We are not a loud [sic] to sell to anyone in Iran or that is going to sell the parts to someone in Iran. Spain has received this exact same order from other dealers in other countries and they found out that these boards were going to be sold to Iran." On or about the next day, ARASH JAM forwarded the email from US Company 1 to MOMENI.

45. On or about May 13, 2015, ARASH JAM emailed US Company 1 and stated for a second time that the machine was in Ras al

Khaimah, UAE. He also stated that the machine was purchased from Spanish Company 2. ARASH JAM then told US Company 1 that Spanish Company 1 could ship the parts to the United States, and that ARASH JAM could take care of shipping from there.

46.    On or about May 14, 2015, US Company 1 emailed ARASH JAM and told him that Spanish Company 1 refused to send the parts to the UAE, and that ARASH JAM would have to arrange to pick up the electrical discharge boards from the United States. On or about that same day, ARASH JAM emailed Global Shipping Company 1 and told it that the shipment now needed to be picked up in the United States at the address of US Company 1, located in the Eastern District of Michigan, to be shipped to the UAE.

47.    On or about May 21, 2015, Global Shipping Company 1 confirmed to ARASH JAM that it had the shipment in its office in the United States.

48.    On or about May 22, 2015, Global Shipping Company 1 sent the nine electrical discharge boards from the United States to the UAE, with an ultimate destination of Iran.

*July 30, 2015 export of one CPU board intended for Iran*
*[US Company 1, purchase 2; Global Shipping Company 1]*

49.     On or about May 5, 2015, ARASH JAM emailed US
Company 1, stating that he needed an additional part, and provided the
part number. On or about May 6, 2015, US Company 1 provided a price
quote for the new part—a CPU board—to ARASH JAM. On or about
that same day, ARASH JAM forwarded the price quote to MOMENI.

50.     On or about May 7, 2015, in discussing the requested part
with ARASH JAM, US Company 1 explained that the part was
expensive because it was the "brains" of the EDM machine. US
Company 1 again told ARASH JAM that it needed the machine model
and serial number to load the correct software onto the CPU board. On
or about this same day, ARASH JAM forwarded this email to MOMENI.
On or about May 12, 2015, ARASH JAM emailed US Company 1,
stating that the machine for which he had ordered the parts was a
2004, model KE 600 machine, with serial number 10.744.

51.     On or about May 13, 2015, US Company 1 sent a new, lower
price quote for the CPU board to ARASH JAM. On or about May 14,
2015, ARASH JAM forwarded the new quote to MOMENI. On or about

the same day, MOMENI responded to ARASH JAM in Farsi and told him to try to get a lower price.

52.    On or about June 23, 2015, US Company 1 sent ARASH JAM a final, lower price quote. On or about that same day, ARASH JAM forwarded that quote to MOMENI.

53.    On or about June 24, 2014, ARASH JAM resent US Company 1's bank account information to MOMENI.

54.    Bank records confirm that on or about June 29, 2015, a bank in the UAE wired funds to US Company 1 for the CPU board. On or about June 30, 2015, ARASH JAM sent a wire payment confirmation to US Company 1. AMIN JAM also obtained a copy of this wire payment confirmation. On or about July 2, 2015, US Company 1 confirmed payment.

55.    On or about July 22, 2015, US Company 1 sent ARASH JAM a packing slip for the CPU board, which ARASH JAM forwarded to MOMENI on or about July 25, 2015.

56.    On or about July 22, 2015, ARASH JAM contacted Global Shipping Company 1 for a quote to transport the CPU board from the Eastern District of Michigan to the UAE. On or about July 27, 2015,

Global Shipping Company 1 confirmed the shipment. On or about that same day, ARASH JAM forwarded this confirmation to MOMENI.

57.    On or about July 30, 2015, Global Shipping Company 1 sent one CPU board from the United States to the UAE, with an ultimate destination of Iran.

58.    On or about February 17, 2016, ARASH JAM contacted US Company 1 to complain that the CPU board was not working properly. US Company 1 again asked ARASH JAM for the EDM machine's serial number and on or about March 7, 2016, he responded that the serial number was 10744 (the same serial number of the machine that Spanish Company 2 had advertised for sale in May 2015). On or about that same day, US Company 1 told ARASH JAM that the EDM machine with that serial number was located in Romania and that if the CPU board that ARASH JAM purchased was programmed for the wrong machine, it would not function properly. US Company 1 told ARASH JAM that it could not help him any further without the correct model and serial number.

*November 14, 2015 export of two servo motors to Iran*
*[US Company 2; Global Shipping Company 3; US Shipping Company 1]*

59.   On September 11, 2015, Iranian Person 1 emailed US Company 2, copying ARASH JAM, to inquire about the freight shipment of two recently-purchased servo motors from US Company 2. On or about that same day, ARASH JAM responded to the email and asked US Company 2 for the packing slip and pickup location of the parts to arrange shipping. On or about that same day, US Company 2 provided ARASH JAM and Iranian Person 1 with a packing slip for two servo motors and a pickup address at US Company 2. On or about September 12, 2015, ARASH JAM forwarded the packing slip and pickup address to MOMENI.

60.   Bank records show a transfer of funds for the two servo motors from a bank in the UAE, through a bank in Uganda, to US Company 2's bank in the United States.

61.   On or about September 14, 2015, US Company 2 sent ARASH JAM and Iranian Person 1 a revised packing slip that included the shipping dimensions and weight of the servo motors, per ARASH JAM's request. On or about that same day, Iranian Person 1 forwarded

the revised packing slip to MOMENI. On or about September 15, 2015,

ARASH JAM forwarded the revised packing slip to AMIN JAM.

62.    On or about September 15, 2015, AMIN JAM sent US

Company 2's packing slip to two freight companies located in Iran. On

or about that same day, one of the Iranian freight companies asked

AMIN JAM for the "HS code" for the shipment. An "HS code" is a

Harmonized Commodity Description and Coding System Code that is

used in international shipping.

63.    On or about September 15, 2015, ARASH JAM asked US

Company 2 for the HS code of the servo motors shipment. US Company

2 responded to the email and provided the HS code on or about

September 16, 2015. On or about that same day, ARASH JAM

forwarded US Company 2's response to AMIN JAM.

64.    On or about September 16, 2015, AMIN JAM provided US

Company 2's packing slip to an Iranian cargo and courier company

located in Tehran, Iran.

65.    On September 17, 2015, AMIN JAM emailed Global

Shipping Company 2, located in the United States, and asked about

shipping "electro motors" to Iran. On or about that same day, Global

Shipping Company 2 asked for US Company 2's name and address. On or about that same day, AMIN JAM sent the packing slip from US Company 2 to Global Shipping Company 2.

66.     On or about September 17, 2015, Global Shipping Company 2 emailed AMIN JAM and told him that the packing slip showed a final destination of Dubai, and then asked for the shipping destination. On or about that same day, AMIN JAM responded "This is addressed to our company in Dubai… But final destination will be IKA (Imam Khomeini Airport)." Imam Khomeini Airport is in Tehran, Iran. On or about that same day, Global Shipping Company 2 responded to AMIN JAM, stating that they could ship the cargo to IKA in Iran, but that the "Shipper must provide copy of the OFAC license." On or about that same day, AMIN JAM responded "Alright. I will ask shipper to provide that."

67.     On or about September 17, 2015, AMIN JAM asked Global Shipping Company 2 for a quote to send the motors by sea. On or about that same day, Global Shipping Company 2 asked AMIN JAM what the final destination sea port would be, and AMIN JAM responded BND (Bandar Abbas, a port in Iran). On or about that same day, Global

Shipping Company 2 asked AMIN JAM what he was looking to ship by sea, because "there is still a sanction." On or about that same day, AMIN JAM confirmed that he was looking to ship a type of "electromotor." On or about September 18, 2015, Global Shipping Company 2 provided AMIN JAM a quote to send the goods from the US to Iran via sea, and repeated that an "OFAC LICENSE IS REQUIRED" (emphasis in original). On or about September 24, 2015, AMIN JAM forwarded the quote from Global Shipping Company 2 to ARASH JAM.

68. On or about October 8, 2015, AMIN JAM emailed Global Shipping Company 2 and told it to proceed with the shipment from the United States to Iran. AMIN JAM told Global Shipping Company 2 that "getting OFAC license is neither possible for us nor is it for the shipper." On or about that same day, Global Shipping Company 2 responded to AMIN JAM, stating that it had to be careful because the proposed shipment was going to Iran. Global Shipping Company 2 asked AMIN JAM for the Iranian client's contact information and provided AMIN JAM with a Shipper's Export Declaration for him to fill out. On or about October 10, 2015, AMIN JAM forwarded Global

Shipping Company 2's email to ARASH JAM, stating that the consignee (the person receiving the goods) was MOMENI.

69.     On or about October 13, 2015, Global Shipping Company 2 emailed AMIN JAM and ARASH JAM and asked them if they "have a license for this electromotor? I can't ship it if you do not have a license." On or about that same day, AMIN JAM responded, copying ARASH JAM, telling Global Shipping Company 2 that "neither me nor my shipper can arrange for this license." AMIN JAM then asked whether "there is a way without it." On or about that same day, Global Shipping Company 2 responded to AMIN JAM and ARASH JAM that there was "No way around it. I can't ship it." On or about that same day, AMIN JAM pressed Global Shipping Company 2, asking if it could take the item in a partial container load (also referred to as a less-than-container load or "LCL").[2] AMIN JAM also asked if other freight companies could fulfill the shipment. On or about that same day, Global Shipping Company 2's employee with whom they had been corresponding

---

[2] An LCL is a form of ocean cargo shipping where a shipper shares the space of a container with other shippers. In contrast, a full container load (or FCL) is a form of shipping where a single shipper owns all of the goods held in a container.

responded to AMIN JAM and ARASH JAM, stating that he would lose his job and that his company would get fined if it shipped these goods without a license. On or about that same day, AMIN JAM asked Global Shipping Company 2 if it could "put Jebel Ali Port [in the UAE] as POD [port of discharge] and then switch BL [bill of lading]." On or about that same day, Global Shipping Company 2 responded to AMIN JAM and ARASH JAM, stating "I can't do that knowing this is to IRAN. You know there is still sanction." On or about that same day, AMIN JAM asked Global Shipping Company 2 to direct him to another forwarding agent who could ship these goods. On or about that same day, Global Shipping Company 2 responded to AMIN JAM and ARASH JAM, stating "I don't know any forwarder that will risk it. U[S] customs can shut them down with big fines."

70.    On or about October 14, 2015, AMIN JAM sent the packing slip from US Company 2 to three different shipping companies in Iran. On or about October 15, 2015, one of the Iranian shipping companies emailed AMIN JAM and provided a quote to ship the electro motors from the United States to Iran. Specifically, the shipment would go from the United States to port Jebel Ali in the UAE, be cross-stuffed in the

UAE (removed from one shipping container and placed in a new shipping container), and then reexported from Jebel Ali and sent to Bandar Abbas, Iran. On or about that same day, AMIN JAM forwarded the quote to ARASH JAM.

71.    On or about October 21, 2015, AMIN JAM emailed the Iranian shipping company and confirmed shipment "to Bandar Abbas" in Iran. AMIN JAM instructed the Iranian shipping company to proceed with picking up the shipment. On or about that same day, the Iranian shipping company responded to AMIN JAM and stated that US Shipping Company 1 would handle the shipment from the United States to the UAE, and asked AMIN JAM to introduce US Shipping Company 1 to the seller (US Company 2). The Iranian shipping company also told AMIN JAM that its trading company in the UAE was Global Shipping Company 3, and that US Company 2 should "issue the packing list, invoice & certificate of origin" to Global Shipping Company 3. On or about the next day, AMIN JAM forwarded this information to ARASH JAM.

72.    On or about October 22, 2015, ARASH JAM emailed US Company 2 and stated that US Shipping Company 1 would arrange for

the pickup of the two servo motors. ARASH JAM also told US Company 2 that it should issue "the packing list, invoice & certificate of origin" to Global Shipping Company 3, as per the Iranian shipping company's guidance and instructions.

73.    On or about October 27, 2015, US Company 2 provided the packing list and invoice to ARASH JAM and AMIN JAM.

74.    On November 1, 2015, the Iranian shipping company emailed AMIN JAM stating that the cargo would leave New York in the United States on approximately November 14, and arrive in Jebel Ali in the UAE on approximately December 12. The subject of the email included "LCL ex USA to Bandar Abbas VIA Jebel Ali."

75.    On or about November 4, 2015, US Shipping Company 1 delivered the two servo motors to a port in New York.

76.    On or about November 14, 2015, US Shipping Company 1 sent two servo motors from the United States to the UAE, with an ultimate destination of Iran.

77.    On or about December 12, 2015, the Iranian shipping company emailed AMIN JAM and told him that the cargo arrived at port Jebel Ali in the UAE.

78.    On or about December 21, 2015, after resolving issues with customs officials in the UAE, AMIN JAM emailed the Iranian shipping company in Farsi, and told it to send the shipment to Bandar Abbas, Iran, as soon as possible.

79.    On or about December 28, 2015, the Iranian shipping company emailed AMIN JAM and told him that it had collected the cargo from the port in the UAE, and that it would "provide you [e]xport booking details with the vessel schedule."

80.    On or about January 4, 2016, AMIN JAM emailed the Iranian shipping company and asked what the estimated time of arrival at Bandar Abbas in Iran was for the goods. On or about the same day, the Iranian shipping company responded, stating that the estimated time of sailing was January 8 and that the estimated time of arrival would be one to two days later.

81.    On or about January 6, 2016, the Iranian shipping company sent AMIN JAM a packing list for the two servo motors, listing the United States as the country of origin, and listing the consignee's [the person receiving the goods] address as Bandar Abbas, Iran. On or about

that same day, AMIN JAM confirmed that information with the Iranian shipping company.

82.     On or about January 25, 2016, AMIN JAM emailed the Iranian shipping company in Farsi and asked that the company give the bill of lading to MOMENI.

### *February 25, 2017 export of two railroad crankshafts to Iran*
### *[US Company 3; Global Shipping Company 3; US Shipping Company 2]*

83.     On or about July 10, 2016, ARASH JAM emailed a Croatian railroad parts company to request a price quote for several railroad parts. ARASH JAM told the company that he was purchasing the parts for the "ministry of transportation in Iraq." ARASH JAM copied MOMENI on the email. On or about July 12, 2016, a US railway parts company emailed ARASH JAM and told him that it had received a referral for the requested parts from the Croatian company. The US company asked for the final destination of the parts. On or about the same day, ARASH JAM stated to the US railway parts company that the parts would be shipped through the UAE to Iraq. On or about the same day, the US company responded to ARASH JAM, stating "OK... I hope that this is not for Iran...."

84.    On or about July 16, 2016, ARASH JAM emailed a French railroad parts company to request a price quote for several railroad parts, again stating that the parts were intended for the "ministry of transportation in Iraq." ARASH JAM again copied MOMENI on the email. On or about July 20, 2016, the French company responded, and wanted to "confirm if the final destination is Iraq." The French company then stated that it was "very closely in touch with requirements in Iraq and we know it is not for Iraq Railways." On or about the same day, ARASH JAM responded to the French company insisting that the parts were for Iraq. On or about July 21, 2016, the French company responded to ARASH JAM, denying his request for a quote, and saying "my colleagues are in direct contact with the Iraq Railways and IRR [Iraqi Republic Railways] ha[s] told us that this requirement is not for them."

85.    ARASH JAM subsequently sent dozens of nearly identical requests for railroad parts to multiple companies on behalf of the "ministry of transportation in Iraq," even though he knew the parts were actually going to Iran. For example, after receiving a quote for railroad parts from a company in China, ARASH JAM asked for the

freight cost. On July 25, 2016, the Chinese company asked to which port the parts would be shipped, and, on or about the next day, ARASH JAM stated "CFR [cost and freight] Bandar Abbas Port, Iran." When the Chinese company asked for more background on the project, on July 27, 2016, ARASH JAM stated that "We urgently need to place the order this week. These are for Iran Raid [sic] Road Organization." On July 28, 2016, a different company provided a quote for ARASH JAM's request for railroad parts, specifically stating that "we are obligated to apply for sanctions export permit."

86.   ARASH JAM continued to send emails regarding railroad parts to companies around the world in August, September, and October, 2016.

87.   On or about October 27, 2016, MOMENI emailed ARASH JAM with a subject line "CrankShaft," the name of US Company 3, and a part number in the body of the email. On or about the same day, ARASH JAM emailed US Company 3 to inquire about purchasing four railroad crankshafts, listed by part number (the same part number MOMENI sent him earlier that day), for the "ministry of transportation in Iraq." On or about October 28, 2016, US Company 3 responded and

sent ARASH JAM a price quote on the four crankshafts. On or about

the same day, ARASH JAM forwarded the quote to MOMENI.

88. On or about November 8, 2016, ARASH JAM emailed US

Company 3 and asked that someone call him to discuss the crankshafts

that he was ordering. On or about that same day, US Company 3 sent a

New Customer Data Form and an End User Certificate to ARASH JAM,

and asked that he return them along with the purchase orders.

89. On or about November 9, 2016, ARASH JAM sent a

purchase order on Austin General Trading [a company associated with

ARASH JAM] letterhead to US Company 3 indicating that it wanted to

purchase two crankshafts. ARASH JAM also returned the New

Customer Data Form, indicating that Austin General Trading was the

business, and that he—ARASH JAM—was the point of contact. He also

returned the End User Certificate, indicating that the customer was the

Iraqi Republic Railways in Baghdad, Iraq. ARASH JAM filled out the

"acknowledgement" section as the Managing Director of Austin General

Trading.

90. On or about November 9, 2016, US Company 3 sent ARASH

JAM wire payment instructions, including bank account information.

On or about that same day, ARASH JAM forwarded these instructions to MOMENI.

91.    On or about November 14, 2016, US Company 3 sent an order acknowledgement and invoice to ARASH JAM. On or about November 16, 2016, ARASH JAM forwarded these documents to MOMENI.

92.    After negotiating the price, US Company 3 emailed ARASH JAM on December 6, 2016, and told him that the crankshafts were completed and available for shipping. On December 7, 2016, ARASH JAM told US Company 3 that he had transferred the money for one crankshaft that day, and on December 8, 2016, ARASH JAM provided a receipt for the wire transfer. Bank records confirm that a bank in Hong Kong wired these funds to US Company 3.

93.    On January 21, 2017, ARASH JAM emailed US Company 3 and stated that he had transferred the money for the second crankshaft. ARASH JAM provided a receipt for the wire transfer, and bank records again confirm the transfer, this time from a bank in Turkey. In this same email ARASH JAM stated that he had overpaid US Company 3 by $6,000, and asked that it send a wire transfer or check for $6,000 to a

bank account in Canada in ARASH JAM's name. After discussing

logistics and other relevant details, US Company 3 mailed a check

dated February 5, 2017, to ARASH JAM in Canada for the

overpayment.

94. On or about February 6, 2017, AMIN JAM emailed Global

Shipping Company 3 and asked for a price quote to ship the crankshafts

from "America to BND [Bandar Abbas, Iran] via Jebel Ali Port [UAE]."

AMIN JAM listed the address of US Company 3 as the pick-up address

and described the crankshafts. On or about February 8, 2017, Global

Shipping Company 3 provided an email quote to AMIN JAM for the

crankshafts to be shipped from US Company 3's location "to B.Abbas

switched via J.Ali."

95. On February 9, 2017, AMIN JAM emailed Global Shipping

Company 3 and told it to pick up the shipment immediately. AMIN

JAM copied ARASH JAM on the email. On or about that same day,

Global Shipping Company 3 acknowledged the booking confirmation

and asked for a contact person at US Company 3. On or about February

9, 2017, ARASH JAM responded to Global Shipping Company 3, with

AMIN JAM copied on the email. ARASH JAM provided a contact at US

Company 3 and told Global Shipping Company 3 to "not mention anything about the cross-stuffing, only that the shipment is being taken to Dubai, UAE." On or about that same day, Global Shipping Company 3 replied "Sir, noted below."

96. On or about February 9, 2017, Global Shipping Company 3 emailed ARASH JAM and AMIN JAM and asked them to inform US Company 3 that US Shipping Company 2 "will contact them under our reference." On or about that same day, ARASH JAM emailed US Company 3 and told it that US Shipping Company 2 would pick up the two crankshafts.

97. On or about February 11, 2017, Global Shipping Company 3 emailed ARASH JAM and AMIN JAM and told them that their shipment was being picked up on February 13 to be taken to the United States port, with an estimated departure date from the United States of February 25, and an estimated arrival date in Jebel Ali, UAE of March 28.

98. On or about February 14, 2017, US Shipping Company 2 delivered two crankshafts to a port in New York.

99.    On or about February 19, 2017, Global Shipping Company 3 emailed ARASH JAM and AMIN JAM and asked for their company's details "in UAE / Iran." It also asked for the consignee's details in Iran.

100.  On or about February 25, 2017, US Shipping Company 2 sent two crankshafts from the United States to the UAE, with an ultimate destination of Iran.

101.  On or about March 1, 2017, ARASH JAM emailed Global Shipping Company 3 and stated that the crankshafts should go to the Zarin Kosar Shayan Company in Tehran, Iran.

102.  On or about March 7, 2017, Global Shipping Company 3 sent ARASH JAM an invoice/packing list showing the crankshafts originating in the United States and going to the Zarin Kosar Shayan Company in Tehran, Iran.

103.  On or about April 3, 2017, ARASH JAM emailed Global Shipping Company 3 and asked it whether the shipment had arrived in Bandar Abbas, Iran. On or about April 4, 2017, Global Shipping Company 3 responded, telling ARASH JAM that the shipment was to arrive in Bandar Abbas on April 9, 2017.

104.  On or about April 20, 2017, after payment was complete, Global Shipping Company 3 sent ARASH JAM a surrender bill of lading showing the two crankshafts being released in Bandar Abbas, Iran. On or about April 21, 2017, ARASH JAM sent the surrender bill of lading to MOMENI.

## Failure to Obtain Required Licenses

105.  The defendants and their coconspirators failed to apply for, receive, possess, and caused others to fail to apply for, receive, and possess one of more license(s) from OFAC to export any of the goods set forth above from the United States to Iran.

106.  All of which constitutes a violation of Title 18, United States Code, Section 371, Title 50, United States Code, Section 1705, and Title 31, Code of Federal Regulations, Parts 560.203, 560.204, and 560.205.

## COUNT TWO
### Conspiracy to smuggle goods from the United States, in violation of 18 U.S.C. §§ 371 and 554

107.  The allegations, manner and means, and the overt acts in paragraphs 1-105 of this indictment are incorporated and realleged by reference in this Count.

108.   Beginning in or around January 2015, and continuing through at least in or around February 2017, within the Eastern District of Michigan and elsewhere, defendants ARASH JAM, AMIN JAM, and MOMENI, together and with other persons both known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, confederate, and agree with each other and with others known and unknown to the grand jury to commit offenses against the United States, and to defraud the United States, specifically, to fraudulently and knowingly export and send from the United States merchandise, articles, and objects—nine electrical discharge boards, one CPU board, two servo motors, and two railroad crankshafts—contrary to a law and regulation of the United States, that is, 50 U.S.C. § 1705 and 31 C.F.R. Parts 560.203, 560.204, and 560.205.

109.   All of which constitutes a violation of 18 U.S.C. §§ 371 and 554.

## COUNT THREE
### Conspiracy to engage in international money laundering, in violation of 18 U.S.C. § 1956

110.  The allegations, manner and means, and the overt acts in paragraphs 1-105 of this indictment are incorporated and realleged by reference in this Count.

111.  Beginning in or around January 2015, and continuing through at least in or around February 2017, within the Eastern District of Michigan and elsewhere, defendants ARASH JAM, AMIN JAM, and MOMENI, together and with other persons both known and unknown to the Grand Jury, did knowingly combine, conspire, confederate, and agree together and with other persons both known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1956(a)(2)(A).

### Object of the Conspiracy

112.  It was the object of the conspiracy for the defendants together and with other persons both known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1956(a)(2)(A), that is, by transporting, transmitting, or transferring, or attempting to transport, transmit, or transfer a monetary instrument or funds to a

42

place in the United States from and through a place outside the United States, that is the UAE, Uganda, Canada, Hong Kong, Turkey, and Iran, with the intent to promote the carrying on of specified unlawful activity, to wit, offenses relating to IEEPA, 50 U.S.C. § 1705, and 18 U.S.C. § 554.

113. All of which constitutes a violation of Title 18, United States Code, Sections 1956(a)(2)(A), (c)(7)(B)(v)(II), and (h).

## FORFEITURE ALLEGATION
**Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(1) and Title 28, United States Code, Section 2461(c)**

114. Upon conviction of a specified unlawful activity, including Title 50, United States Code, Section 1705 or Title 18, United States Code, Section 554, or a conspiracy to commit a specified unlawful activity, in violation of Title 18, United States Code, Section 371, the defendants shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to these violations, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

115.   Upon conviction of an offense in violation of Title 18, United States Code, Section 1956, the defendants shall forfeit to the United States any property, real or personal, involved in such offense, and any property traceable to such property.

116.   The United States will also seek a forfeiture money judgment against the defendants, which represents a sum of money equal to the value of any property, subject to forfeiture in connection with the offenses of conviction.

117.   If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants,

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property that cannot be subdivided without difficulty;

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as

incorporated by Title 18, United States Code, Section 982(b)(1); and

Title 28, United States Code, Section 2461(c).

**THIS IS A TRUE BILL.**

*s/ Grand Jury Foreperson*
Grand Jury Foreperson

Matthew Schneider
United States Attorney

Michael C. Martin
Chief, National Security Unit

*s/ Hank Moon*
Hank Moon
Assistant United States Attorney
211 W. Fort St., Suite 2001
Detroit, MI  48226-3220
(313) 226-0220
Hank.Moon@usdoj.gov
Bar No:  DC 1026010

Dated: November 04, 2020

| United States District Court<br>Eastern District of Michigan | Criminal Case Cover | Case:2:20-cr-20550<br>Judge: Murphy, Stephen J.<br>MJ: Whalen, R. Steven<br>Filed: 11-04-2020 At 04:11 PM<br>SEALED MATTER (LG) |

NOTE: It is the responsibility of the Assistant U.S. Attorney signing this form to complete it accurate

| Companion Case Information | Compa |
|---|---|
| This may be a companion case based on LCrR 57.10(b)(4)[1]: | |
| ☐ Yes ☑ No | AUSA's Initials: |

**Case Title:**     U.S. v. Arash Jam, Amin Jam, and Abdollah Momeni Roustani

**County where offense occurred:**     Washtenaw

**Offense Type:**     Felony

Indictment

## Superseding Case Information

**Superseding to Case No:** _____     **Judge:** _____

**Reason:**

| Defendant Name | Charges | Prior Complaint (if applicable) |
|---|---|---|

---

**Please take notice that the below listed Assistant United States Attorney is the attorney of record for the above captioned case**

November 4, 2020
Date

Hank Moon
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
Hank.moon@usdoj.gov
(313) 226-0220

---

[1] Companion cases are matters in which it appears that (1) substantially similar evidence will be offered at trial, or (2) the same or related parties are present, and the cases arise out of the same transaction or occurrence.  Cases may be companion cases even though one of them may have already been terminated.